Good morning, Your Honors. May it please the Court. My name is Jason Owens. I represent the appellants in this action. Misty Jones and Stephanie Gray were defendants below. They filed a summary judgment motion invoking the defense of qualified immunity. Most of the case was actually dismissed. The only things left were the individual capacity claims against former officers Gray and Jones. This was on a Section 1983 case brought by the plaintiff, now appellee, Eddie Humes, who was incarcerated in the White County Jail in Searcy, Arkansas in mid to late October of 2017. The claim that he makes is that Gray and Jones denied him medical care in violation of his 14th Amendment rights. This appeal is of the denial of qualified immunity to these officers. Essentially, the appeal is that the law as it stands did not put these officers on reasonable notice that what they were doing, even allegedly, would violate the law. The District Court cited the Hartsfeld case, Hartsfeld v. Colburn, a dental care case, in which the officers and even medical professionals in that case intentionally denied medical care or dental care for substantive dental complaints for some two months. In the case that we're dealing with, there's a delay of three or four days at the most. Well, what do you make of Dad v. Anoka County where it was a two-day delay? Well, that's a different case as well, because in that case, you had a plaintiff who was a day or two post-dental surgery. Again, another dental case, which is different from our case. He was a day or two post-surgery and actually came to the jail with his prescribed medication from his provider, Vicodin in that case, I believe. And the nurse was told about it on multiple occasions and refused to administer it or even check on the verification of the same, as did the guards. So we're talking about a prescribed medication there, whereas there was no such prescription in this case. Also, the doctor in that case told the nurse to give pain medication, ibuprofen, I believe. It may have been naproxen, but over-the-counter pain medicine, and the nurse refused that as well. Again, those facts just don't exist here. Instead, what we've got here is, at most, and to be fair, my clients deny that they saw Mr. Humes at all, but for summary judgment purposes, we have to accept what he said, which was that they saw him every day for several days before he was sent to the hospital on October 25th of 2017. And they saw a swollen, possessing arm or hand or whatever it was? According to him, they saw... We have to take that. Right, right. According to him, they saw an arm that was swollen to the size of a watermelon. Now, we know watermelons in Arkansas. Watermelons are not small. Watermelons are large, large. And he said it was oozing pus. Now, if we fast forward to the 25th when he goes to the hospital, none of those things are noted. So what we've got here, and the district court describes this a couple of times in conclusory fashion, as a growing infection. But actually what we've got, based on the district court's citation to the facts, is what appears to be a dramatically improving condition. But does it matter that the nurses allegedly saw it when it was the small watermelon size, with the description that Judge Grunder's given? It matters a lot. And the reason it matters a lot is because the standard here for Gray and Jones is whether the risk to the health of this individual was obvious to a layperson. And so when the nurse saw this on the 21st and then dealt with him again on the 24th, she passed the buck on down the road. Is there any evidence that the nurse spoke with your clients? There was any communication about Mr. Humes? Only on the 24th is the only evidence that I know of where there was some evidence that there was communication between Gray and the nurse because Gray actually used, I'm sorry, the nurse actually used Gray's account login information to respond to his sick call request. But there's no, as I understand it, there's nothing in the record that would indicate that your clients were relying on the nurse or the nurse's assessment of Mr. Humes' condition. No, and the district court pointed out, I think that's mostly fair. But I think what the nurse's conduct does show is that it wasn't obvious in terms of an emergent need, which again is different from these other cases, these dental care cases like Hartsfield. It cites three or four other dental care cases. The shortest time window is three weeks. But didn't the trial judge find that the testimony of Humes and his cellmates was credible and that that evidence was that there was an obvious medical problem that was observable and was, in fact, observed. And she found credible that the in-person complaints were made to the jailers. And those are facts that we're not at liberty to review because the findings of fact, as made by the judge, are not subject to our review here. Well, credible might not be the proper term, especially, Your Honor, because But it's what she found. That's what she found. Judge Rudofsky said Judge Rudofsky found, yeah. Said that it was difficult to square what he testified with the hospital records from just a few days later because he was describing this massive swelling with oozing pus, none of which was documented in the hospital record only a few days later, which means either one of two things. Either he's lying about what presented, or it dramatically improved over those three days. But again, does the dramatic improvement affect Let's say that that's the situation that happened here. Does that take away from the description that Humes has given, that he says that your client saw and that the district court sort of, I'll say, credited for purposes of summary judgment? And what happened later is maybe for the jury to assess. It does, though, I think, for two reasons, one factual and one legal. The factual reason is that in addition to describing this large swelling, and, of course, these are lay people looking at this. They can't diagnose an infection, particularly whereas here, throughout, until he's sent back from the hospital the first time, there's no evidence of any fever, which, of course, is the hallmark of malignant infection. There's no evidence of any of that until after he's sent back from the hospital the first time. But they're looking at this, and in addition to that testimony about the watermelon-sized oozing pus, he also says he saw them every day. And so if he sees them every day, then they're seeing this swelling go down. They're seeing this discharge stop. None of these other cases deal with that situation where you've got an improving situation. In fact, most of these cases deal with situations that cannot improve as a matter of medical definition. So your argument is that it's blatantly contradicted by other evidence in the record, right? No. No? No, I'm saying accepting everything that he says. Accepting everything that he says, what you're actually dealing with here is he did not testify that the swelling was going down and the oozing had stopped. That's coming from some other record, right? That's coming from the hospital record, which was unrebutted on the summary judgment motion. So those hospital records are dispositive proof of his condition, I would argue, on October 25. And so if his condition was markedly worse than the days before, then it must have gotten better. In these days when they're seeing him, they're seeing his condition improve. None of these cases that are cited by the court or the appellee deal with that situation. Does that really matter, though? I mean, maybe if you can show that it got better each day as it went, but when you're presented with something that's serious and requires medical attention, which I think an extremely swelling, pus-filled hand would, you know, normally you'd have to get treatment. If it miraculously cures somehow, fine, but you'd still have to get treatment at the time. Well, so first of all, I don't think that the cases stand for that proposition. And also as a medical matter, swelling can be indicative of a whole host of things, from a sprained ligament to there's just all sorts of reasons for swelling. Discharge is maybe a little bit different, but where the discharge stops on its own. But frequently it is infection related to swelling. It can be, but when it's that, it's usually accompanied by fever, which didn't exist here. But did he get medical care? Wasn't that part of the claim that he was saying, I want to see someone and no one came? So did he have an opportunity to get his temperature taken? I don't know what the record is on that. Well, except he did on the 21st. Well, number one, he doesn't testify that he had a fever or that he even felt hot in his deposition or in any of his affidavits or anything. But he also was seen by the nurse on the 21st who looked at presumably all these same things and said, I'll come check on you tomorrow. Was there a temperature taken on that day? There's nothing in the record to that effect, no, your honor. The other point is that not only was it found to be non-emergent, and that's what we're dealing with here, which is so different from Hartsfeld and some of those dental care cases where you're dealing with, yes, three weeks in a month and six weeks are too long. What we're talking about here is not whether three weeks or a month or six weeks is too long. It's about whether this was an emergent need. The nurse found that it wasn't on the 21st. The ER physicians found that it wasn't on the 25th. So even if this court accepts the district court's description, which I believe is belied by its own factual recitation, they determined it wasn't an emergent need on the 25th because they sent him right back with no treatment at the hospital. And that's after imaging. They perform imaging. The plaintiff testified about an X-ray being conducted. Based on all those things, Your Honor, we don't think that any of this would have been obvious to a layperson. I see that I'm getting into my rebuttal time, so unless there are additional questions, I'll stop there. Very well. Thank you. Good morning, Mr. Porter. May it please the Court, good morning. Mr. Rand argued that somehow Mr. Humes was miraculously healed from his wound, but the record indicates that he was taken to the hospital finally on October 25th after being bitten by a brown recluse spider on the morning of October 20th, which is a very serious situation, a brown recluse spider. I've been bitten by one. And so he complained to the jail, hey, I got bitten by this brown recluse spider. A jailer came in an hour later on October 20th about 3 o'clock in the morning after Mr. Humes had complained, oh, that's not a brown recluse spider, and just kicked it out of the drain, just being dismissive. But as far as being miraculously healed, it's interesting, because finally when Mr. Humes was taken to the hospital on October 25th, he was given Bactrim, which is an antibiotic. He was prescribed Naproxen, 250 milligrams. He was also given prescription medication, which the jail did not even give to him. And so that's found in the record at 174, the appendix, and also 43-48 at page 29. Mr. Humes continued to get worse because the next day on October 26th, he was finally taken, he was taken again to the hospital where it was about 3.58 p.m. He had a temperature of 103 degrees. His arm was still swollen. It was noted in the record. Now Mr. Humes initially described that his swelling was about the size of a small walnut. And we all know that when you get bit by something that's poisoned as a brown recluse spider, the swelling continues. This poison stays in and continues to deteriorate, and that's what was going on. And so Mr. Humes, and even in the record, Mr. Austin Coughlin, who was an inmate with Mr. Humes, signed an affidavit saying, look, this man needs medical attention. He needs medical attention. And the other inmates were afraid that they were going to get some kind of staph infection because he was oozing with pus and the swelling. And they tried to get help for him. Mr. Humes complained on the 20th when he got bitten. He complained on the 21st when the nurse came to see him, which was probably about a day and a half later when the nurse finally came to see him. She said, well, we'll just wait it out and see what it's going to be about on the next day on the 22nd. The nurse never came back. Mr. Humes continued to complain. Now, I will submit to the court that this court didn't have jurisdiction to even hear this case because what the appellants are complaining about is that the judge got the facts wrong. One of the things that the appellants contend, well, they don't even remember seeing Mr. Humes. But Mr. Humes remembers seeing her, these two ladies. Mr. Humes, although he initially thought that one of them was a male because we're talking four years later after his deposition was taken. But the fact of the matter is Mr. Humes remembers seeing these jailers, Misty Jones and Stephanie Gray, and also Austin Coughlin signed an affidavit saying the same thing. So those are facts that were not refuted by the other side. The other side just simply said they don't remember it. Mr. Owens said that the records when he did go to the hospital don't reflect any, I think, swelling or oozing, that sort of thing, and that was allegedly unrebutted. Is that the record? I disagree with that. On page 7 of my brief, Your Honor, it says, when Mr. Humes was taken back to the hospital on October the 26th of 2017, it was again noted that Mr. Humes, quote, complained of worsening pain, redness, swelling to the right hand, a patient seen here yesterday for the same and given rosepin, R-O-C-E-P-H-I-N, and dismissed with K-Flex and Bactrim. And that's in the record. And so when he appeared at the hospital on both the 25th and the 26th, it was noted that he had swelling, redness, and he was in pain. And so we believe, Your Honor, that the record does reflect that. And that's what the court found. And so these are findings of facts that the appellants are not happy with. But again, we just don't think that the court has jurisdiction to even see this. And you're talking about being put on notice. There's a case law, and I cite it in my brief, that talked about the seriousness of brown recluse spider bites and staphelitis. And these cases were back as early as 2012, 2017. I'm sorry, 2012 and 2000. On page 23 it says, The brown recluse spider bite and MRSA infection are sufficiently serious to support an Eighth Amendment claim. And this is from the case of Santana Riles versus Terry Rackley, which is citing the case of Myrick, M-Y-R-I-C-K versus Anglin, which is a Seventh Circuit case out of 2012. And also there's a 1997 case. So these jailers were on notice. And when you have someone who says, I've been bitten by a brown recluse spider, that should put them on notice that this is a serious medical situation and that they need to not waste any time in dealing with it. Mr. Humes continued to complain. He's a captive audience. He's in the jail. The jail has a responsibility of providing him medical treatment for a serious medical need, and the jail just didn't do it. And they can't hide behind this nurse because the nurse didn't even see Mr. Humes after the 21st. And so it's the jail responsibility. Mr. Humes continued to complain to the jail, and yet the jail didn't do anything. And finally when he filled out this medical slip through the kiosk, now keep in mind that there was a buzzer in the jail, in the cell where the inmate could push the buzzer to get attention. He continued to do that on the 20th. He did it on the 21st. He did it on the 22nd. He did it on the 23rd. And when these jailers came to him, they said, well, we got you on sick call. We got you on a medical request. And so Mr. Humes just assumed that they were going to do that for him, that they were going to get him the medical attention. And so he kept hitting the buzzer. And so finally he filled out a grievance on the 25th. On the morning of the 25th, he filled out a grievance. And in the grievance he talked about how he had been bitten by a brown recruit spider some four days earlier and that no one had come to his aid, and he was grieving that situation. And finally the jail responded and took him to the hospital on the morning of the 25th, where it was noted again that his arm was swollen and that he was having redness. Now we all know there are times when pulse come out, and I hate to be using that word, pulse come out, and then there are times when it dries up. That doesn't mean that it's getting better. Obviously it didn't get better because when Mr. Humes was taken to the hospital for the second time on the 26th, that's when the doctor realized we need to do emergency surgery. And they had to go in and basically cut out all the dead tissue in this man's hand. That was done, that was caused by the poison that had set up over a period of time. Was there any in the affidavit from the cellmate, Mr. Coughlin? Yes. Was there anything about, I think he did talk about the pulse, but was there also about the swelling? Yes, Your Honor. As I recall, yes. He put in the affidavit that there was swelling and that the other inmates who were in the pod with Mr. Humes were afraid that they were going to catch something. So in other words, there were a number of people that noticed this. Yes. This wasn't something that. And it should have been common to a lay person. If the inmates knew something was wrong and something was going amiss, then certainly these jailers who have more training should know that something was wrong and that this man needed medical attention. And again, when Mr. Humes said, I was bitten by a brown raccoon spider, that should have sent off red flags right there because that is a serious situation. It's probably almost equivalent to being bitten by a black widow spider because that is a serious, serious situation. Now, the appellate in this case said, well, Mr. Humes didn't use the kiosk to fill out a sick report. Well, but again, he kept pushing above it and he kept telling these jailers that he needed to get medical attention. And they can't hide behind that. Now, the magistrate judge said, well, Mr. Humes is going to have a lot of explaining to do. Why did he wait until the 25th to use the kiosk to finally ask for medical treatment? He used the kiosk before. Well, that kind of goes to the issue of credibility. And again, at the summary judgment stage, judges can't make credibility findings. And so this case really, you know, I had a very sad situation where my client, a lady by the name of Sharon Alexander, was taken to the jail, Pulaski County Jail after a shot lifting charge, chronic asthma, and she had her asthma pump with her. Well, the jail took the pump away from her. And she kept pleading and asking for her pump. And the inmate, she was in such a weakened condition that the inmates brought her down and sat her in front of the nurse. And the nurse said, well, until she fill out a sick slip, I can't see her. And the inmates helped her fill out a sick slip, and she was on to be seen by the nurse the next day. Unfortunately, three hours later before she died, and she died of asphyxiation. Again, when inmates present with a serious medical condition, it is incumbent upon the jail to provide that medical treatment for them. And that didn't happen in this case. It didn't happen in a timely fashion. And it's interesting to note that when the jail finally realized how serious this was, and they should have known that it was serious anyway, but when the jail realized that Mr. Humes had to have medical treatment, had to have an operation, had to have surgery, then they kicked him to the curb. They let him go. They OR'd him out of the jail. Why? Because they didn't want that responsibility, that medical bill. And so they OR'd him. And so Mr. Humes went through several months of treatment where he had to get his wound constantly packed and treated, had to have home healthcare situation. Again, the facts, when viewed in favor of Mr. Humes, certainly indicates that summary judgment was denied properly, as it related to Ms. Jones, as it related to Ms. Gray, because the evidence clearly demonstrated that they knew about the situation, and yet they took no action. They delayed, certainly delayed by several days of getting Mr. Humes the treatment that he needed. And again, the qualified immunity doesn't apply, because the jailers were on notice by these cases that a brown recluse spider, and they argue, well, they think it was really a staph infection. It doesn't matter. Brown recluse, staph infection, whatever it was, it was serious because of these cases. Let me ask you, is there any evidence that Jones and Gray were aware that the nurse saw your client? I don't think so, Your Honor. I'm not, I haven't seen anything in the record. The only thing they kept telling him was, they kept telling him, we're not medical, we got you on sick call, and somebody will see you. And so I don't think they were aware of that. Unless there are any other questions, I don't, I've used, I said what I need to say. Very well. And we ask, Your Honor, that you affirm the decision in denying qualified immunity in this case. It was kind of interesting when I look at the cases that talk about interlocutory appeal and how it should be the exception and not the rule. I'm up here all the time on interlocutory appeals on qualified immunity. So were we. I've been doing this for 37 years. I'm just getting too old for this, Your Honor. So I'd be glad when we get to the exception part of it. But anyway, I'll get off my sofa. Thank you, Mr. Porter. Respond on a couple of things. First of all, it was actually Mr. Humes who described his problem as a staph infection in that October 24th medical request. The defendants didn't describe it in that way. He did. But even when he did, the nurse thought it appropriate simply to put him on sick call for the next day because this wasn't obvious to laypersons. The question becomes, is there verifying medical evidence in the record to demonstrate that there was a detrimental effect to his prognosis based on any delay that was occasioned by the defendants? There just isn't any. Instead, all the proof shows that even if you accept everything that he said, even if you say the officer should have done something, that something they would have done was relay the condition to the nurse, who there's no evidence to suggest would have taken any other actions other than what she did. There's certainly no cases out there that says that jailers, lay jailers, have a duty to bypass the medical professionals on site and send someone with swelling that is improving with a discharge that is going away. I think you might have a decent argument if, in fact, they were aware that the nurse saw him. But apparently there's no evidence of that. Or if they communicated with the nurse about this situation, then maybe they could rely on her expertise, but that's not our record. Agreed, because on summary judgment you have to adopt what he says instead of the real facts. But the point here is that regardless of whether they interacted with the nurse, what they would have done, in other words, the action, if you ask the question, what should they have done differently? Well, they should have referred him to some medical authority. That would have been this same nurse who took these actions. Where's the evidence to suggest that she would have done anything different? And even if they bypassed her and sent him to the hospital, where's the evidence that the hospital would have done anything different other than send him right back like they did on the 25th? Where, by the way, there's no evidence they found a fever even on the 25th, which is an important point on the no fever point. But the 26th they did, right? The 26th they did. In fact, later in the day on the 25th at the jail they found fever for the first time. The last point I want to make, well, let me make this point. At the summary judgment hearing, the judge spoke about some testimony that the plaintiff gave that a doctor told him allegedly that the delay caused harm or something of that nature. Our position is that that's an admissible hearsay, even under Rule 56C2, which says that the materials cited in support of a fact must be presentable in admissible form at trial. The materials submitted here were the plaintiff's deposition testimony. That testimony would never be admissible at trial because it's hearsay within hearsay. They didn't offer anything from the doctor himself. We would also ask that qualified immunity be given to Jones on the basis that both the plaintiff and his cellmate testified that Jones was a man and Jones was a woman. For those reasons, we would ask that qualified immunity be afforded. Thank you, Your Honor. Very well. Thank you, counsel. Court appreciates your arguments today and briefing. Case is submitted and will be shown opinion in due course.